The next matter is National Grange v. CRS Auto Parts The next matter is National Grange v. CRSAuto Parts The next matter is National Grange v. CRSAuto Parts  Mr. Ogimbe, whenever you are ready. Good morning, Your Honors. My name is Andrew Greenberg. I'm a member of the Chartwell Law Offices. My law firm represents National Grange Insurance in this declaratory judgment action that was adjudicated before the District Court. The District Court found that my client... So you want to reserve time for rebuttal before you start? I apologize. I did ask the clerk to reserve two minutes for rebuttal. Thank you very much. The District Court adjudicated this matter by providing the appellee, CRSAuto Parts, with temporary insurance coverage for a 30-day period, July 1, 2003 through July 31, 2003, on the basis of an insurance binder that the court ruled my client's authorized agent issued on June 30, 2003. And we've got a verdict here, and the findings that flow from that. So your burden is obviously a high one. Let me put it this way. We haven't discussed the case. Tell me what I'm missing here. It seems to me we have some credibility issues on whether or not the loss of information was disclosed to Turley. Before the binder was given, the District Court clearly found that, except for the testimony of, I guess it's Givenish, the employee of CRS, who said that I told them everything, the District Court accepted that a binder is given. The whole concept of a binder is you've got insurance, it's bound. And that was before the accident. There was some backdating apparently, but that everything occurred after the insurance that was bound was in place. Why isn't this a pretty simple case? Well, it was never a simple case because there was never a consistent story from all the participants in the case. Yeah, but the District Court heard all that, and he decided who was credible and who wasn't credible. Right. At this point, we have a finding that there was no misrepresentation, at least prior to there being the issuance of the binder. And that's supported by the record. It depends on who you believe. It's supported by the record. Yeah, I mean, I guess I could quibble with that in that the judge in making that ruling and issuing that finding of fact relies upon the testimony of Mr. Turley, the insurance agent, who in the same breath also indicated that CRS did not provide him with information regarding a non-renewal of insurance that had occurred two months earlier. That's a credibility judgment of the trial court. Right, and it certainly is frustrating from my client's standpoint that the judge accepts one sentence, rejects the next sentence, accepts the following sentence, and so forth. That's what you tell jurors. You can believe part or none of a witness. I understand that. That's certainly a frustrating part of the case. It's corroborated by the amount of the premium that given us. I think it was said he was surprised by the level of the premium, the amount of the premium. And I don't know. I'm not sure the evidence suggests how that premium compared to the prior premium in their period in charge of the non-renewal. But that's consistent with the disclosure of risk, that the premium here, at least in the terms of the testimony of Givenish, was elevated. Why is it elevated? It's elevated because they've got these losses that they suffered in the non-renewal from the prior insurance, so they have to pay more to cover the risk. Right, but it wasn't consistent with their contention that they could have very easily obtained the same insurance from the same carrier that provided coverage to the parent company, KS Group. None of what they said made any sense. If they could have gotten a better deal with the other carrier, then why didn't they do that? But we're talking about evidence that was heard and weighed. And if you've got a pitch for clearly erroneous fact-finding, you ought to make it. But I haven't, I didn't see it as I read. I saw you say in your reply brief, quote in footnote two, the manner in which the trial court addressed credibility of the witnesses in this case remains perplexing, unquote. But perplexing really isn't the standard, right? Of course. They're erroneous. We're perplexed all the time. I know. We really are. And that's true. And I was expressing the sincere feeling of my client, that it was perplexing. But that, of course, is not the basis for the appeal. The question that you asked me, and then I'll try to address, is this. Where was the misrepresentation? Well, the misrepresentation was... Misrepresentation before the binder. Right. Right. I'm not, my client's position is it doesn't matter that there was, that it can't prove based upon the judge's findings of fact that there was a misrepresentation before the binder was issued. But doesn't that misinitiate the whole idea of a binder? Well, no. I think under the, I think that the Supreme Court of Pennsylvania and the Klopp versus Keystone insurance decision, which I think the court even, in the memorandum opinion, quotes... Well, Klopp and Keystone, because there, the failure to disclose this incredible driving history occurred after the insurance was given. It was clear that had the insurer known of the speeding records and the history of accidents, they wouldn't have given the insurance. In fact, what was it, the next day after they, I shouldn't, that was a tragic case, but the next day after they got insurance not disclosing the driving record, to no one's great surprise, perhaps, other than the cops, there was an accident. But there wasn't this case where here there's the insurance is given, it's bound, and then the accident. And there's a finding that there's no omission before the insurance, there's no materiality because the agent knew everything that he had to know to give the insurance before it was given. Now, you're arguing, I think you said at the beginning, that surely it's not really your agent, but I'm not sure, do you want to make that argument? Yes, I think I have to make that argument. Well, I guess you do. I'm certainly bound by the difficulty that my client faces with respect to the facts. But I guess, let me, if I could, address the first question you asked me, because obviously it's the pointed question. In describing the rule of law that's at issue in this case, and that is the basic black letter rule is, if there's a material misrepresentation in the application, that will render the binder null and void ab initio. Now, the question is, when does that misrepresentation have to occur? Is there any ruling in Pennsylvania that provides that the misrepresentation must occur before the binder is issued? No, there is no such ruling. The court is actually silent in that regard. Now, you don't address your opponents who raise cases from other jurisdictions which do talk about that. The Sawyer case from Georgia, which is pretty explicit in saying, if there's, well, I don't want to misquote it, so I'll quote it. It says, an insurance company cannot assert that a factor is material to the risk about which it has neither made inquiry or apprised its prospective insurer, unquote. And here, that's the finding of the district court. Anything about risk it needed to know or ask through its authorized agent, it got. So, why isn't the reasoning of the Sawyer court from Georgia applicable under these circumstances? Because I don't think the Sawyer court, or CRS in this case, appreciates the character of a binder, or what a binder is meant to do. Well, what happened in this case? Well, what is a binder meant to do? Well, a binder is meant to be on the spot, temporary insurance coverage. Well, what does that mean? Does that mean it's binding in coverage? It means it's providing coverage without reflection, without an application verification, with a minimal amount of assessment of the risk. And then, doesn't that, by definition, going to what Judge Lurie was asking earlier, mean that you got to live with that period of time where maybe you haven't done everything you otherwise would, but you live with it? Well, I prefer to look at it this way. The prospective insured lives with the scenario this way. The prospective insured accepts the benefit of temporary insurance and then has an obligation thereafter to provide accurate historical information in the application. So there's no obligation. Doesn't that relieve the insurance company entirely of the burden of doing anything with respect to the binder? Under your reasoning, wouldn't it just be the case that insurance companies could say, yeah, I'm buying your insurance, whatever. If I don't like what you say two months from now, you don't get it. But, sure. No, I don't think so. Because if, in this case, all the, if the insurance, hold on. I'm sorry, let me ask this. I'm sorry to interrupt, but in your answer, answer this. What incentive would the insurance company ever have to do any kind of investigation with respect to a binder, if we were to accept your argument? Your verse is true. We'd incentivize them to do absolutely no investigation because any discrepancy that popped up in the interim, that could arguably be deemed material, would give them the benefit of. . . I understand the question. Excellent question. First of all, in answering the question, let me point out a distinction between a rescission of an insurance obligation and a termination of an obligation. Obviously, the rescission looks backward. The termination of the obligation looks forward. In a situation where a binder is issued, the obligation of the prospective insurer thereafter, if the application is not prepared before the binder is issued, and in most instances, that's what occurs, I think. I don't think that an application is normally prepared and a binder is issued. I mean, in this case, what happened? We have a binder supposedly issued on June 30, 2003. What's supposedly about it? I mean, there's a finding of fact. We're not in supposedly. Finding of fact, the judges found that a binder was issued on June 30, 2003. We have an accident that occurs on July 10, 2003, and we have an insurance application that's completed the following day on July 11, 2003. Okay? So either there was an effort to create retroactively insurance coverage. That's one possibility. The judge rejected that possibility. Or the other possibility is, gosh darn, the insurer just ran out of time and was desperate to get immediate coverage. It had to get coverage as of July 1, 2003. So what do you do in that situation? There's no governing Pennsylvania law on whether a subsequently discovered misrepresentation voids the contract of an issue. Right. There's no decision that talks about the timing issue, when the misrepresentation has to occur. We have to decide what we think the Pennsylvania courts would decide. That's right. But let me give you, in response, Judge Jordan, to your question. In a situation where a binder is issued essentially in haste, that the prospective insured requires coverage instantly. There is a rather perfunctory assessment of whether or not the claim falls within certain guidelines and so forth. There is no true verification process that can be undertaken at that point. There is a need at that point for on-the-spot insurance, temporary insurance coverage. That is all done. And then all that's left to be done is for the completion of an application. Now to avoid... As a matter of public policy, you would have a say that to the extent that the insurance company, whose job it is to assess risk, is wrong in that initial period, it gets to take it back. No, it gets to take it back only in the sense that... Well, let me follow through on the thought. Suppose in this instance, suppose what happened was that the on-the-spot temporary insurance coverage is provided and then the application form is presented to the insured and the insured fills it out and fills it out completely and honestly and indicates in that application, yes, we had substantial losses, yes, we had a non-renewal, yes, we are part of a larger organization. That's all accurate information. And then that's reviewed by the underwriters in home office. Now what is the option of the insurance company at that point? Is there an opportunity to rescind, to look backward and eliminate coverage of an issue? No, because there's been no material misrepresentation. Does the insurance carrier have the right at that point after reviewing that fully and accurately completed application to in the future terminate or choose not to provide coverage into the future beyond that 30-day period? Sure. So are both sides protected? Yes. In this case... What you're not helping me with is what's the policy rationale? Because there's no law here, we've agreed. There's not binding law or even any guiding law really in the state of Pennsylvania at this point. So what, in fact, in your briefing you say it makes no practical sense to allow the defendant here to have what the defendant is asking for. I'd ask you to explain the practical sense of allowing an insurance company to make a business decision through an agent to bind coverage, take money, accept a risk, get business, and then later say, even though there's no misrepresentation at that juncture, and later say that that coverage isn't binding. What's the practical effect of that other than your client wins in this case? Considering your answer, the impact it would have on the car industry, because that's how cars are sold. It's with a binder. The person buys the car, drives off a lot, they're insured. They think they're insured. And if you're arguing that a full application has to be filled out and approved by the underwriter before the purchaser can rest assured that he or she really is insured, that's not going to do the car industry a lot of good. Well, but the insured is protected if it provides accurate information in the application. The question that Judge Jordan asked of you was he put accurate information into his question because that's the finding we have here. No misrepresentation. No material misrepresentation. No misrepresentation prior to the execution of the or the issuance of the binder. But in that instance where the binder is issued on an on-the-spot basis where there's no time for reflection because the insured presents to the insurance agent, I need coverage today. There's no opportunity to conduct a full investigation. The assessment made by the insurance agent is essentially, is this the kind of business that the company I'm representing will accept? Is this company of the size or character that is consistent with my guidelines with respect to this particular company? That's essentially the kind of analysis that's undertaken at that point. The time for reflection. You should bear the risk of error then. It seems to me that the insurance company has decided that's how they, for very good and legitimate reasons, they've decided and for very helpful reasons, that's how they want to write their policies. I won't say write the policies. That's how they're going to conduct business. Are you saying that in that situation, as a policy matter, it's the consumer who should bear the risk of loss or error as opposed to the insurance company who made the decision to create the impression that that person was really an insurer? Well, I think the insurer bears the risk in those situations where a binder is issued and the insured fairly and accurately completes an application following the submission of the binder. In this case, if… That's not my crit. Sorry? That's no risk. The risk is if it turns out that there's been a misrepresentation. Well, if it turns out there's been a misrepresentation, then in the future the carrier will not provide coverage. But the insured is notified that the coverage will not be provided in the future and at that point the insured has the opportunity to try again either with another company or with that particular company. In this case, all the insured had to do was prepare an accurate application and if that had occurred, then the carrier wouldn't have been in the position of saying, we wish to rescind of initio. But that's not answering Judge Lurie's point though. Where's the risk? There's no risk at all for the insurance company if during a period of time when it's not relying on anything except accurate information. No, but there is a risk. Because if the… Well, what? Well, the risk is that if in this case, if the application had indicated, the application completed 10 days after the issuance of the binder. If that application had indicated, yes, we were non-renewed, yes, we have a substantial loss history here, yes, we are the subsidiary of a larger company engaged in the same business we engage in throughout the United States and overseas. At that point, the carrier could have decided, you know what, after further review and after further reflection, we choose not to extend coverage beyond the 30-day period. That's going forward. I know it's going forward, but, Your Honor, this case involved a death that occurred on July 10 within that 30-day period. My client would have been responsible for that. My client could not have rescinded of initio. It could have terminated prospectively into the future. So my client would have assumed the risk had the insured simply filled out the application correctly without misrepresentations. We're talking past each other. We're talking past each other. I understand the scenario you've laid out, which is a counterfactual. I'm endeavoring in two or three different ways, and I apologize if I'm being inarticulate about it, and I'm riding on Judge Lurie's question now in terms of risk to try to make it happen, to get you to explain how it makes sense, what the practical sense is. Where's the risk for a risk insurer if, in the window in which the accident happens and there's coverage bound, it can go back and say, based on later events on which it was not relying at all when it bound the coverage, you know what, we're taking it back. It's not the circumstance you've described. It's the circumstance we've got here. Where's the risk for the insurance company if it can proceed as you've described? Isn't the risk entirely on the insured in those circumstances? No, I don't believe it's on the insured. Because? Because all the insured has to do is be fair and accurate in the application, and therefore it guarantees itself coverage during that 30-day period. We just time warped again. In the absence of knowledge, there's a risk. In the absence of knowledge, there's a risk, and if it turns out that nothing happens, that doesn't mean that there wasn't a risk to begin with. Is that your point? My point is that there's no risk, and I can't articulate any better than I have. If the insured completes a subsequent application, having already been provided with a 30-day binder, with 30-day temporary coverage, provided that the insured fairly and accurately completes a subsequent application, it has that coverage, even if at some point in the future, after fully reviewing and investigating the information in that application, the insured chooses not to continue coverage beyond the 30 days. Now, my time is completed, so I was going to go on my second argument, but I can defer to… Well, you'll have some time for rebuttal. Go ahead. Can I ask one question before we go? And this has to do with the procedural posture of this case. There's a court of common pleas suit going on in Montgomery County, I think, before you come to court with your DEC action. Am I right about that? Don't remember. The case was interesting procedurally because it really began as a workers' compensation case. It was being held before the issue of coverage was actually being litigated before a workers' compensation judge in Chester County. Here's the point of my question. It looks like, although it's very difficult to tell from the record, it looks like this very accident was proceeding to be litigated in state court in Montgomery County before this DEC action was filed. Now, maybe I got it wrong, but if I'm right about that, I'm wondering why did that happen? Why are we here in federal court? If the accident was in litigation in the court of common pleas in Montgomery County? Well, that was a third-party civil action that was undertaken by the plaintiffs against various non-employer entities. At the same time, in conjunction with that third-party civil action, a workers' compensation action, actually two workers' compensation actions for each employee who was injured were instituted within the workers' compensation system. I was involved in the defense of those workers' compensation actions before a workers' compensation judge. Part of the defense of those actions was lack of coverage. That issue was litigated briefly in front of the workers' compensation judge. It languished a bit. It didn't appear as if, because it was a somewhat unusual issue for workers' compensation judge, it seemed as if it was going to continue to languish. So, a decision was made to, in essence, remove it from the workers' compensation arena and file the DECSHA action in an effort to hopefully resolve the coverage issue. In the meantime, the third-party civil action brought by the plaintiffs against other non-employer entities proceeded. And when it was alleged that the employer, in this case, perhaps had no coverage, the plaintiffs chose to file in accordance with provisions of the Workers' Compensation Act, chose to proceed with civil actions against the employer as well in Montgomery County. So, yes, it has a somewhat twisted procedural history. Thank you. Thank you, Mr. Greenberg. Good morning, Your Honors. May it please the Court, my name is Heather Thomas, and I'm here on behalf of CRS Auto Parts. And I would just like to say I believe the Court actively reflects our issue with this case. There was a factual finding that there was not only no misrepresentations prior to the binder, there was no misrepresentations by CRS material otherwise, even after the accident. So, I mean, we're dealing with a factual finding of absolutely no misrepresentations at all. We also have the issue of, and I know that counsel didn't address it, but I believe he's planning to in his rebuttal, that Turley was not the agent of National Grand Insurance. He did mention that. Yes, and that clearly is not the case. In fact, there's a finding of fact that he had the authority to bind, and he did, in fact, bind. Therefore, it's grounded in the evidence. And also, they're trying to, National Grand is trying to assert that the finding of fact, I'm sorry, that Turley was not the agent because he wrote brokered business. There was a finding of fact that Scheibel, who was the other entity involved, referred the business to Turley. Therefore, Turley clearly was the agent of National Grand, and all of the evidence says so. That's your case? Yes. And you're sticking to it? Yes, Your Honor. Okay. All right. Thank you. Thank you. No one ever gets penalized for not using all that time. You sure don't. You don't. Mr. Greenberg has never a good time when the other side basically just says, I rest on my brief. I know. I once had a case in front of the Pennsylvania Supreme Court where the, Rolf Larson was the presiding judge, and he turned to me and he said, Mr. Greenberg, after listening to what we all thought was a rather inept argument by my opponent, he turned to me and he said, Mr. Greenberg, do you feel the need to make any argument here today at all? And I said, Your Honor, I've been here all day. If you don't mind, I'd just like to say a couple of things. I made my argument, and then three weeks later I received a decision, and adverse to my client, the fellow who had won, who had made the inept argument. Something you said. Hopefully that will happen today. When you go to the agency, I think that's what you want to address. Anyway. Even if there's no actual agency, and it seems to me that's a really tough argument for your window, there's no actual agency. How can there not be an apparent agency? This is a company that had written in the past. He's referred by someone who apparently is an actual agent. The business gets referred, accepted money, and forwarded it to your client. How can you not at the very least get an apparent agency out of this? And your client knew what was going on. Well, I guess the argument really is, suppose in this instance, Mr. Turley had issued a binder providing CRS with umbrella coverage of $10 million, and that that was in violation of the restrictions on his ability to bind the company. Now, if that were the case, I think we would all agree that that binder would have been null and void because he had no authority to bind National Grange, assuming that I'm right about that, that he had no authority to bind National Grange to provide coverage in that amount of money. I think we would all agree with that. My client's position is that Mr. I'm not sure there wouldn't be an apparent agency. I don't know. That's a tougher question. It is. And of course, CRS ought to have no way of knowing what his authority was in terms of how much he could bind. But I don't think it would matter in that case. I don't think that if he violated the rules and regulations to which he is obligated to honor and were to attempt to bind $10 million way beyond his authority, that that would be a binding obligation on the part of the insurance company. But it might result in a situation where, as opposed to the insured being on the hook for it, that your company would have a cause of action back against Turley. That may be. What happened in this case, though, was that Mr. Turley acted beyond the scope of his agency agreement by essentially producing work that had been underwritten, so to speak, by either a subagent or a broker. This was the Callan Insurance Company. It was the Callan Insurance Company that gathered the information. It was the Callan Insurance Company. If you're right about that, how would CRS possibly know that? I don't think it matters that they…  No, I don't think it matters. And I'll tell you why. Because CRS didn't hire Turley Agency for the purpose of obtaining coverage from National Grange. Now, that assertion, I saw it in your briefing, but that goes to the, I guess, your legal argument that if somebody comes and says, get me insurance instead of saying, get me National Grange insurance, that they're not really an agent of National Grange Insurance. But you should speak to your opponent's response to that in their brief where they say, as a matter of statutory definition, what the insurance company is proposing is impossible because the way it's laid out in the statutes, an agent who is… anybody who's appointed as an agent of an entity can't possibly be a broker. It's off the table. That's not how I read the definition. I thought it was just merely definitional. What is an agent? What is a broker? In this particular instance, the evidence of record establishes that Turley is providing… Your argument is he's a broker, right? Yeah. And then point to the Pennsylvania statute, the insurance code, which defines, which has a definition in it, and it says, according to your opponent, that the definition of broker specifically excludes one who is, quote, appointed as an agent of an entity, unquote. That's a specific exclusion. And since Turley was appointed as an agent, couldn't possibly have been a broker, according to their argument. Yeah, but I think the case law talks about what actually occurs in the particular case. It doesn't rely upon a black letter definition of agent versus broker. It relies upon the assignment that the particular insurance professional undertakes in that given situation, as I was saying. That would certainly make the statutes awfully loose, wouldn't it? Well, I don't – I read that as simply definitional. I didn't read that as controlling any particular situation. The case law seems to say that you look at each instance and you determine how the insurance professional was undertaking his or her responsibilities in that instance. But in this instance… But here we have a finding of agency, though, don't we? Sorry? Here we have a finding of agency, which seems to me is clearly – the record adequately supports that. Well, I think it's a matter of law as to whether he was acting as the agent for national brokerage. It's mixed. It's a conclusion of law based upon the facts that the court… Right. But in this instance, we know, based upon the testimony that was presented in front of the judge, that Turley did essentially nothing in terms of the underwriting process. It was all done by the Count Agency. It was the Count Agency that gathered the information. It was the Count Agency that obtained motor vehicle abstracts even after the motor vehicle accident occurred. Count Agency was still the entity that was obtaining motor vehicle abstracts. It was the Count Agency that informed CRS that I have found you coverage. It was the Count Agency that submitted premium information to CRS. It was the Count Agency… Count has no relationship at all with National Grange. It was the Count Agency that submitted the insurance proposal, the National Grange insurance proposal, to CRS. As a matter of fact, the witness who testified in front of the judge basically said, I had nothing to do with the Turley Agency at all. I dealt with Count. And that is precisely the scenario that the agency agreement that Turley had entered into with National Grange prescribed. It didn't permit. And so in that instance… Well, then why is it your remedy to go and have a dispute with Mr. Turley for breaking his agency agreement as opposed to denying coverage to the person who walked in the door to a place that was holding himself out based on an insurance agency agreement which is in the record as an agent of your client? Well, it's certainly a point that CRS has made in this case that my client's remedy should be an action against Turley and certainly that's a possibility. But it's almost like saying, you know, when I read that, it was almost like me hearing in a personal injury lawsuit case, well, you know, it doesn't matter, jury, if you rule against the homeowner because he's got an insurance company anyway who's going to cover it. He'll be taken care of, don't worry about him. That's almost the kind of argument that I sense. That's not what we're saying. We're saying that you're making a legal argument based upon the repercussions formed to your company and I think what's being suggested by the press and the questioning is that if you're right in terms of the adverse impact from the courts ruling on your company, the way to remedy the adverse impact is not by denying the coverage here when the record doesn't support that, but by bringing a separate cause of action against the person that acted in derogation of their agreement. That's true. That's certainly a possibility. My client maintains, however, that the material misrepresentations in the application should have rendered that binder, which was not the product of any reflection, null and void ominatio, and further maintains that the binder was issued in an unauthorized binder since it was based upon product that had been brought to it by a sub-agent or broker with whom it had no relationship whatsoever and that was the Kellen Agency. For those two reasons, my client is respectfully requesting that the trial court ruling be overruled. Thank you very much. Thank you very much. Take a matter into advisement. Thank you very much for your argument.